U.S. Equipment Company [1] v. Commissioner. U. S. Equipment Co. v. Commissioner
Docket Nos. 85378, 85379.
United States Tax Court
T.C. Memo 1963-261; 1963 Tax Ct. Memo LEXIS 82; 22 T.C.M. (CCH) 1309; T.C.M. (RIA) 63261; September 26, 1963
*82 Held: 1. Amounts incurred by a corporation in the operation of hydroplane racing boats, which were for the dominant purpose of advertising its business, were proximately related thereto, and from which the corporation derived substantial economic benefits, are deductible as ordinary and necessary business expenses under sec. 162(a), I.R.C. 1954. W. D. Gale, Inc. v. Commissioner, 297 F. 2d 270, distinguished. 2. Racing boat expenses incurred by the corporation were not income taxable to its principal stockholder since the operation of the boats was not his hobby and such expenditures were not personal in nature. American Properties, Inc., 28 T.C. 1100, affirmed 262 F.2d 150, distinguished. 3. Deductions for gifts to individuals allowed in part and disallowed in part; and included in part in income of individual petitioners. 4. Deduction for expenses of operating a Ford station wagon disallowed for failure of proof; and included in income of individual petitioners. 5. Deductions for travel and hotel expenses disallowed for failure of proof. 6. Useful life of building and proper allocation of purchase price between land and building for depreciation purposes determined. 7. Rent paid *83 by corporation to its president and principal stockholder for use of building was reasonable. Melvin S. Huffaker, Pell Hollingshead, and Roderick K. Daane, for the petitioners. Julian R. Ettelson, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in income taxes of the corporate and individual petitioners for the taxable years and in the amounts as follows: Docket
Taxable Years
Number
Petitioner
Ended April 30
Deficiency
85378
U.S. Equipment Company
1956
$ 5,308.87
1957
15,610.70
1958
29,392.83
Calendar Years
85379
George Simon and Shirley Simon
1956
$15,110.34
1957
39,907.44 Petitioners and respondent have made certain concessions, leaving the following issues for decision: 1. Whether amounts incurred by U.S. Equipment Company in connection with the operation of hydroplane racing boats were ordinary and necessary business expenses under section 162(a), Internal Revenue Code of 1954. 2. Whether amounts incurred by U.S. Equipment Company in connection with the operation of the racing boats constitute taxable income to George and Shirley Simon. 3. Whether amounts incurred by U.S. Equipment Company for gifts to various individuals were *84 ordinary and necessary business expenses. If not, whether they were taxable income to George and Shirley Simon. 4. Whether amounts incurred by U.S. Equipment Company in connection with the operation of a company owned Ford station wagon during the taxable year ended April 30, 1958, were ordinary and necessary business expenses. If not, whether they were taxable income to George and Shirley Simon. 5. Whether amounts incurred by U.S. Equipment Company during the taxable year ended April 30, 1958, for travel and hotel expenses of Shirley Simon and other individuals were ordinary and necessary business expenses. If not, whether they constitute taxable income to George and Shirley Simon. 6. Whether depreciation deductions on a rented building which were claimed by George and Shirley Simon for the taxable years 1956 and 1957 were excessive. 7. Whether rent paid during the taxable years ended April 30, 1956, 1957, and 1958, by U.S. Equipment Company to George Simon for use of premises located at 6540 East Palmer Avenue, Detroit, Michigan, was excessive. Findings of Fact Some of the facts have been stipulated and are so found. U.S. Equipment Company (which together with its predecessor, the *85 sole proprietorship by the same name, is hereinafter sometimes referred to as "petitioner" or "corporation") was incorporated under the laws of the State of Michigan on October 1, 1954. Its principal place of business is 6540 East Palmer Avenue, Detroit, Michigan. Its Federal corporate income tax returns for the taxable years ended April 30, 1956, 1957, and 1958, were filed with the district director of internal revenue at Detroit. Throughout these years George Simon (sometimes hereinafter referred to as "George") was the sole stockholder of the corporation. George and Shirley Simon are husband and wife, residing at 274 Lothrop, Grosse Pointe Farms, Michigan. They filed their joint Federal income tax returns for the taxable years ended December 31, 1956 and 1957, with the district director of internal revenue at Detroit. Petitioner is the successor of a sole proprietorship operated under the name "U.S. Equipment Company" by George Simon from 1947 until its incorporation on October 1, 1954. George owned all of petitioner's outstanding stock until April 30, 1958, when his brother Joe Simon, became a minority stockholder. Since the first directors' meeting on October 4, 1954, George has *86 been president; Mitchell Simon, vice president; and Joseph Simon, secretary and treasurer of the corporation. George, a Syrian immigrant's son, was born on February 1, 1924, in Detroit. His father, a wholesale grocer, died in 1934, leaving his wife with seven young children. George, his brothers and three sisters, and their mother struggled and worked to hold the family together. George received his early training with machine tool operations at the Henry Ford Trade School. After finishing there in late 1941, George remained to teach chemistry and tool design. In 1942 he left to join the Navy Aviation Cadet Program. He completed the program in 1945 at which time he was commissioned as a Naval officer and as a pilot. He served as a Navy flier until he was discharged from active duty on December 19, 1945. Thereafter he flew once a month with a Naval reserve squadron until he requested a discharge in 1950. After returning from military service, George went to the Ford Trade School to arrange to have some credits transferred. He was told that he had a real future with the Ford Motor Company. He was sent to see Rudy Herclots, the general master mechanic at Ford. Herclots requested him to *87 stay and work in his division, which was engaged in buying surplus Government equipment. At Herclots' suggestion George went with one of Ford's buyers to a Government warehouse. He there discovered that dealers were paid a 12 1/2 percent commission by the War Assets Administration for all equipment purchased through them. It was then that George decided he would rather sell to Ford on a commission basis rather than buy for Ford as an employee. George applied to the War Assets Administration for a dealer's license to permit him to sell used machinery as a commission agent. Several months later his application was denied. He went directly to see the man in charge of the Detroit office and convinced him of his qualifications and was then issued the license. Immediately thereafter he began doing business as "Veterans Machinery Company," a sole proprietorship. He opened an office in a bedroom of his mother's home. Things went slowly in 1946. During this time his brother-in-law, Fred Wissman, was working with him and sharing the profits. In 1947 Wissman left and George then continued in the used equipment and machinery business under the adopted name of "U.S. Equipment Company." For a short *88 period in 1947 his brother, Joe, worked for him. During the period from 1947 until the outbreak of the Korean War in 1950, George experienced difficulties selling because of his youth and also because he was not well known in the industry. In Detroit alone there were numerous dealers. Despite George's youth, he was a hard working and enterprising young man. Between 1947 and 1949 his business increased with gross receipts going from $35,266 in 1947 to $89,640 in 1949. However, the company's sales for this period were almost exclusively confined to customers in the Detroit area. There are many used equipment and machinery dealers in the United States. Frequently information is exchanged between dealers. They publish weekly, bi-weekly, monthly, and quarterly lists of machines they have for sale. Some of the dealers print rather elaborate brochures and catalogs. Some of these are of the display type having pictures of the machines; others merely list machines alphabetically. Some dealers publish "machines wanted" bulletins. When industrial concerns dispose of assemblies of equipment it is customary to publish lists of the surplus equipment with invitations to bid. Several trade publications *89 are widely read in the used equipment and machinery industry. These include the Surplus Record, which is published monthly and contains an alphabetical index of machinery; the Used Equipment Directory which contains an alphabetical listing of machine tools; the Industrial Machinery News, which is in a tabloid newspaper format and is essentially a display type publication utilizing art work, pictures, and photographs of machines. A considerable amount of communication occurs between dealers. They often call other dealers for information on machines listed in one of the publications. The interested dealer requests the serial number and price. If the machine sounds interesting, the dealer, sometimes accompanied by the user-customer, travels considerable distance to inspect the machine. Generally the most important factors considered by dealers and users when purchasing a used machine tool are condition, age, and price. Users search for the best machine at the best price to do a particular job. Purchases of new or used machinery are occasioned by one or more of the following factors: an increase in plant capacity, necessity to replace obsolete or worn out equipment, the production of a *90 new product, or the beginning of a new job. Users purchasing used equipment had employees who kept in close touch with the used equipment and machinery market. This was done through the reading of trade publications. Many equipment dealers periodically sent out catalogs and listings of available machinery. There were also frequent personal contacts with dealers. Essential to any sale or purchase of used machinery is inspection, which is usually conducted by the master mechanic or dealer. A substantial part of any dealer's business in the used machinery industry is done with other dealers. Large companies, such as Ford Motor Company, when desirous of selling used machinery, will send out requests for quotations to a list of usually 40 to 50 users and dealers whom they consider active prospects for buying such machinery. Willys Motors, when acquiring used machinery, will obtain quotations from 10 to 15 used machinery dealers. The machines are inspected by master mechanics or technical people to see if the low bid is responsive as to condition. On occasion the master mechanic or other technical persons charged with the responsibility of inspecting the machine will locate the machines *91 desired and in some instances will purchase without receiving other quotations, under their general authority to acquire what is needed. The used machinery business is not standardized with respect to selling methods, but personal contact and entry to customers' plants are important sources of business. The used machinery industry is one in which company names and the names of individual persons in such companies are used interchangeably and synonymously. Dealer and user customers and prospects were able to and did identify the U.S. Equipment Company and George Simon interchangeably. Occasionally in the used machinery industry a particular dealer will become identified in the minds of other dealers with a particular customer and considered to have the "inside track" with such customers. Transactions between two dealers are frequently handled on a so-called commission basis in which the dealer earning a commission on the sale reflects on his books only the amount of commission earned, rather than the total sale price of the machine in question. There are variations in transactions between dealers, such as straight commission sales, brokerage transactions, consignment sales, and a multidealer *92 partnership for selling a particular machine. Some dealers in the industry specialize in a particular variety of machines, but the petitioner did not. In 1950, at the outbreak of the Korean War, the used machinery business changed rapidly into a seller's market. At that time George moved the office of petitioner from the bedroom in his mother's home to a building with store front windows consisting of office space and a warehouse. These premises afforded George his first indoor storage space for his limited inventory which consisted at that time of approximately 30 to 35 machines. The advertising methods used by George in the early Korean War period consisted of advertising machinery in trade journals and sending out cards to a mailing list of prospective customers. There was no difficulty in this period in selling any inventory the petitioner had. The only problem was to locate and buy machinery for sale. In early 1952, the Korean seller's market began to fade for the whole used machinery industry. George then joined the Machinery Dealers National Association. Other dealers expressed their concern with the slump in business. George began to search for effective ways of preventing *93 the slump from affecting his business. He thought his principal problem was getting in to see people in authority. About this time George had occasion to discuss his advertising and sales problems with a Mr. Englander of the Englander Furniture Stores, with whom he had been previously acquainted and whose business judgment he respected. Englander recommended that he consult with a Mr. Openheimer, his sales promotion man, and he arranged the meeting. Openheimer impressed George with the need to make himself known and suggested various means of doing so, i.e., ghost-written engineering articles, memberships in the "right" clubs, and the use of a symbol. George was particularly impressed with Openheimer's advice. The petitioner at that time had developed a shield-emblem and George wanted to make it the business "trade mark." The projected cost of the program recommended by Openheimer was about $25,000 to make an impact right at the beginning, plus 10 percent of gross receipts per year thereafter. George and his brothers decided that this was too expensive. As shown by Exhibit 33, the Machinery Dealers National Association has compiled an Index of Used Machine Tool Sales, based on reports *94 from 100 companies, of which petitioner is one. The index, in which 1957 = 100.00, contains an annual index for 1947 through 1962, except for 1950, and a quarterly index commencing with the first quarter of 1953. Joint Exhibit 6-F, shows U.S. Equipment Company's sales for all fiscal periods through April 30, 1959. Annualizing the corporation's sales for the short fiscal periods ended September 30, 1954, and April 30, 1955, and adjusting the index to the average of the quarters ending most closely approximating each of the company's fiscal periods, gives a reasonable comparison of the petitioner's sales progress to that of the Used Machine Tool Industry, as follows: Year or Fiscal Period
U.S. Equipment Company Sales
% Increase or Decrease Over Prior Year
Insustry Sales Index
Industry % Increase or Decrease in Index
1951
$ 445,462.36
139.2
1952 461,944.63
Plus 3.7%
114.4
Minus 17.8%
1953 631,062.28
100.9
Minus 11.8%
1954 (9 mos.) 365,088.28
1954 (annualized) 468,774.37
80.5* *95 Minus 23.7%
1955 (7 mos.) 371,224.47
1955 (annualized) 636,384.84
Plus
30.7%
73.6*
Minus 8.6%
4-30-56 1,202,928.99
Plus
89.0%
98.1*
Plus
33.3%
4-30-57 1,158,715.63
Minus
3.7%
108.3*
Plus
10.4%
4-30-58 1,504,071.65
Plus
29.8%
92.5*
Minus
14.6%
Net Percentage Change 1951--4-30-58
Plus
237.6%
Minus
33.5%
Average Net Annual Change 1951--4-30-58
Plus
23.6%
Minus 4.7%
A compilation from the sales of each fiscal period, as shown in Joint Exhibit 6-F, into sales by location of customer, sales from the State of Michigan and from Windsor, Ontario, being compared with sales from all other areas, shows the rapid growth of U.S. Equipment Company: Local Sales
Year or
(Michigan
Sales Outside
Period
Total Sales
and Windsor)
Local Area
1947 thru 1949
$ 199,006.49
$197,756.49
$ 1,250.00
1950
185,675.02
182,175.02
3,500.00
1951
445,462.36
426,357.05
19,105.31
1952
461,944.63
350,649.03
111,295.00
1953
631,006.28
556,224.12
64,782.16
1954 (9 mos.)
365,088.28
194,547.27
170,541.01
1955 (7 mos.)
371,224.47
242,624.97
128,599.50
4-30-56
1,202,928.99
563,732.45
639,196.54
4-30-57
1,158,715.63
611,333.63
547,383.00
4-30-58
1,504.071.65
520,839.65
983,232.00
SUMMARY Local Sales
% of
% of
Year or
(Mich.
Total
Sales Outside
Total
Period
and Windsor)
Sales
Local Area
Sales
1947 - 1952 inc.
$1,156,938.19
89.54%
$ 135,150.31 *
10.46%
1953 - 4-30-55
1,003,396.36
73.39%
363,922.67
26.61%
4-30-56 - 4-30-58
1,695,905.73
43.84%
2,170,810.54
56.16%
Facts *96 Concerning Racing Boat Expenses and Depreciation After his conference with Openheimer, George Simon decided to talk to dealers and others about how he could improve his sales. He talked to Edward Savage, who was at that time master mechanic at the Kaiser Engine Division. In the course of these conversations Savage recommended the purchase of an unlimited class racing hydroplane to publicize George's business. He advised George that it would interest mechanically minded people, who were the principal customers of U.S. Equipment Company. Savage was an avid speed boat enthusiast. George also talked to other people, including Dan Foster, who was prominent in unlimited hydroplane racing circles. Foster recommended a racing boat as an effective advertising device. He recommended a used boat costing from $8,000 to $10,000 as a start. Simon then talked to his brothers, Joe and Mitchell, and to other members of his family. They were mostly opposed because they considered a racing boat too expensive and too dangerous. In addition, George talked to Henry Drettmann, a customer, about expanding his business nationally and internationally by means of a racing boat. He also called Dan Arena, a *97 hydroplane maker, who advised George that he could build him a new racer for approximately $12,500. George and Ed Savage then visited Dan Arena's shop in Mt. Clemens, Michigan, and were shown details of the boat Arena proposed to build. George was impressed with Savage's interest in the technical phases of the gear-box and engine and thought that this interest in a master mechanic would open "a lot of doors" in his business. After George returned from Arena's shop, he told his brother, Mitchell, that he was going to buy a racing boat and use it as his "trade mark" for advertising purposes. Mitchell, who was doing the petitioner's accounting, questioned whether the expense of the racing boat would be deductible. George then telephoned the district director of internal revenue, Mr. Menninger, for an opinion. Menninger told him that he could not give him a formal opinion until he had seen his past experience, but indicated that it may very well be deductible if George intended using the boat in the way he had indicated. George contracted to purchase his first unlimited hydroplane racing boat in the late summer of 1952. After ordering the boat, a radio sportscaster announced that George *98 Simon of U.S. Equipment Company was building a boat to compete in the Gold Cup race. The press likewise came out with an article that George Simon was building a boat and would try to bring the Gold Cup back to Detroit. As a result of this publicity, petitioner's customers would telephone George and inquire about the building of the racing boat. When the boat was completed and delivered, it had on both sides of the tailfin a reproduction of the company symbol, the shield upon which was written "U.S. Equipment Company, Detroit." The name of the boat, "Miss U.S.," which stood for U.S. Equipment Company, was placed on the sides of the boat along with the registered racing numbers. George attempted to register the boat with the American Power Boat Association at its office in Detroit so that he could challenge for the Gold Cup. He was told that he had to join a yacht club so that the club could make the challenge. He did so. He then returned to the American Power Boat Association and registered the boat in the name of U.S. Equipment Company. However, several days later he was required to file a new registration in his personal name since the association rules prohibited a boat from being *99 raced in the company name. The boat was shipped to Seattle with Dan Arena's crew. George Simon and his party, which included Sage and Savage, flew to Seattle. It was George's intention from the time he decided to purchase the racing boat to drive it personally in its races so that he could secure publicity as the sole proprietor of his business and to increase the public relations impact. He discovered upon his arrival in Seattle that other drivers were complaining because George had no driving experience. He was forced to withdraw. Dan Arena drove the first race. In line with his original intention, George drove in 7 races. In his second race on June 19, 1954 (Maple Leaf Regatta in Windsor, Ontario), his boat turned over and he was injured. Reluctantly, he continued to drive the boat until he could find a professional replacement with a winning reputation. He located one in 1955. George's last race as a driver was in the Silver Cup in August 1955. Between September 18, 1955, and October 23, 1958, a Miss U.S. boat was entered in 32 races and won 8. These races were held in several locations throughout the United States. In October 1954, George incorporated his sole proprietorship *100 under the corporate name "U.S. Equipment Company." No public announcement was made of this fact to customers or dealers. The racing boat and equipment were transferred to the corporation along with other assets and liabilities of the sole proprietorship. The income tax returns of George and Shirley Simon for the calendar year 1953 and the first 9 months of 1954, insofar as they relate to the sole proprietorship, were audited by the respondent. The examining agent's report adjusted the depreciation life of the racing boat and contained the following finding: Race boat depreciation and related expenses have been allowed since taxpayer uses this for advertising purposes. Shortly thereafter, the corporation was audited for the period October 1954 to April 30, 1955, and as to the racing boat, the revenue agent made no adjustments except those based on the depreciable life of the boat and equipment. A picture of its racing boat was shown in petitioner's advertisements in about one-third of the monthly issues of the Industrial Machinery News. In each edition of the Industrial Machinery News, however, the corporate shield-emblem was shown. During the years 1953 and 1954 the boat was sketched *101 with a slogan, such as "Miss U.S. says: Speed Up Your Production With Late Type Tools" or "Home of the Gold Cup Challenger, Miss U.S." From September 1956 through May 1957, the boat was shown in a sketch and an invitation to visit the warehouse and see the Silver Cup boat winner on display and talk with the crew that maintains and races the craft. The August 1957 advertisement was a large picture of the boat coming out of a television set and called attention to the fact that the Miss U.S. I and Miss U.S. IV would be televised live on nationwide TV in the Gold Cup races on August 11. The petitioner carried ads in Resale Magazine, another trade journal which was published twice a year, showing a sketch of the boat and the legend: "Miss U.S. says * * * Speed Up Your Production With Late Type Tools." Throughout the years in issue and commencing prior thereto, George and other employees and sales representatives who were actively engaged in outside selling, employed a calling card upon which the Miss U.S. I was pictured, together with the shield-emblem of the petitioner and the company name, address, and telephone number. During the years in question, the petitioner used its shield-emblem *102 and sometimes pictures of the Miss U.S. I on "handout" devices, such as ash trays and steel measuring tapes. These "handouts" were given to customers and prospects of the petitioner in substantial numbers. Equipment lists sent to customers during the years 1956 through 1958 contained either the company's shield or a picture of the Miss U.S. boat. Beginning in July 1956, after its move to the Palmer Street premises, the corporation used a colored picture of the Miss U.S. on all company checks and the company shield was used on the tear-off portion attached to the check, which is retained by the payee. The corporation entertained master mechanics, customers, and prospective customers at boat races in which Miss U.S. I was entered prior to and throughout the years in issue. Such contacts were invited to watch the races from the pits. When races were held on the Detroit river, customers' wives would be invited to watch from the lawn of the Whittier Hotel. The company sometimes used pit passes to accommodate its customers. In the pits the Miss U.S. crew, and sometimes customers and their children, wore T-shirts and sweatshirts which contained the company's shield and a legend reading "U.S. *103 Equipment Company - Tool Room and Production Machinery." In addition, customers were sometimes given sun hats bearing the company name and identifying its products. In the pit area there was usually a tractor-trailer unit used in transporting the Miss U.S. I overland. Prominently lettered upon this tractor-trailer unit were the following: "U.S. Equipment Company. Tool Room and Production Machinery. New and Used. Detroit, Michigan." Customers throughout the years in issue were invited to ride in the Miss U.S.I. Those who accepted the invitation were customarily given a wallet-sized card denoting their membership in the "100 Mile Per Hour Club" and certifying the speed at which they had traveled and the date upon which the ride took place. The reverse side of this card contained a colored picture of the Miss U.S. in motion. From 1953 on, the corporation displayed the racing boat at its business premises except when the boat was away from the plant for racing or testing. In a few instances, prior to 1956, when the boat was displayed outside the warehouse or at nearby locations, the boat was usually displayed in front of a large store window near the office entrance to the premises. At *104 the Palmer Street premises the boat was displayed in the plant area just behind the company offices. On various occasions the boat was displayed at civic functions in Detroit, such as the Detroit Boat Show, church picnics, and Naval installations. On such occasions a cardboard poster was displayed with the boat. It contained the boat's racing history and significant data about the U.S. Equipment Company which was identified as the owner. Trophies and racing pictures were displayed by the corporation in its business premises during the years in issue. After remodeling its offices, a conference room was installed in which most of the trophies were displayed. Mechanically minded people such as master mechanics, engineers, and others who deal with close-tolerance machinery are the principal people with whom the corporation dealt. Some of them showed interest in unlimited hydroplane racing and particularly in the Miss U.S.I. The technical aspects of high performance racing craft are appealing to technically inclined individuals and generate greater interest among such people than is true of the general public. George, as well as the salesmen of the corporation, used the Miss U.S. I as a *105 device for meeting prospects and as a source of conversation preliminary to discussing a sale. Conversations regarding the boat enabled George to establish friendly relations with master mechanics and others who were in a position to purchase petitioner's equipment. An awareness of the Miss U.S. I on the part of master mechanics, customers and prospects facilitated the entry of the corporation into potential customers' places of business. The Miss U.S. I was directly or indirectly responsible for some customer contacts which resulted in substantial sales by the corporation. For example, George Walther first came to the U.S. Equipment Company in 1954 while on a buying trip to Detroit because he had seen the company advertisement featuring a picture of the racing boat. He had never heard of George Simon before that time. He was interested in race boats and wanted to see the Miss U.S.I. He arranged his schedule so that he called on other dealers first in order to allow them to see the boat at the company headquarters. Walther's company, Dayton Steel Foundry, subsequently purchased $22,500 worth of used machinery from petitioner in the same year, and its affiliated company, Dayton-Portsmouth *106 Foundry, purchased an additional $17,000 of equipment, also in the same year. Another contact which was made directly because of the Miss U.S. I was with Hugo Niehaus of the Wilhelm Karmann Company of Osnebreuck, Germany. Niehaus was in Detroit in 1955 to investigate the acquisition of a large press from the Murray Corporation. While driving down Grand Boulevard near the Murray Corporation, he saw the Miss U.S. I on display at the premises of the U.S. Equipment Company. He stopped and examined the boat and talked at some length with George and Joseph Simon. He expressed great interest and amazement over the technical details of construction and performance and, in fact, asked to be taken for a ride in the boat. The Wilhelm Karmann Company in the first year of contact, the fiscal year ended April 30, 1956, purchased $171,620 worth of machinery from the corporation and made substantial purchases in subsequent years. Other foreigners besides Niehaus expressed interest and were attracted by the Miss U.S.I. A notable example is Mario Lopez of Sao Paulo, Brazil. He was originally recommended to the company by Lloyd Rhein, a master mechanic of the Tecumseh Products Company. Lopez was taken *107 for a ride in the Miss U.S. I and subsequently became known as the "fastest Brazilian on water." His purchases were handled through his New York exporter, Schwaback Company of New York, and amounted in the fiscal year ended April 30, 1958, to $293,465. Miss U.S. I, George Simon, and the corporation received publicity in various news media such as radio, television, and newspapers. Approximately one-half of the newspaper articles for the period prior to April 30, 1958, identify the business of the corporation. Others refer to "George Simon's Miss U.S.I." The boat also received publicity by word-of-mouth among the engineers, master mechanics and others in the shops of customers and prospects. Other used machinery dealers were interested in the Miss U.S. I and discussed the racer among themselves and with their customers. Prior to his acquisition of the first Miss U.S. racing boat, George had not owned a boat of any description and had absolutely no interest in them. He had seen only one boat race. George was not known as a sportsman, although the newspaper publicity he later received tended to create that impression. The boat racing expenses were not incurred for the personal use, benefit, *108 and pleasure of George Simon. Boat racing was not his hobby. George and Shirley Simon were not socially active. His membership in the Detroit Yacht Club was mandatory and obtained solely in order that his company's race boat might enter the American Power Boat Association sanctioned races. His use of a yacht club during the years in issue was infrequent, modest, and predominantly for business entertaining, plus some charitable use for which the corporation was reimbursed. In these years George and Shirley Simon were active in church work and other charitable affairs. The following racing boat expenses and depreciation deductions, along with other expenses related to the racing program, were disallowed by respondent: Taxable years ended April 30
1956
1957
1958
Depreciation
$4,024.83
$ 6,026.39
$ 7,545.63
Airline Travel
1,844.70
2,098.05
6,410.92
Hotels
306.89
104.62
2,114.39
Boat Parts & Repairs
1,373.59
10,633.29
13,537.24
Boat Transportation & Travel
7,260.53
Miscelianeous Boat Wages and
Tax
7,190.06
Total Racing Boat Expense &
Depreciation
$7,550.01
$18,862.35
$44,058.77 Facts Concerning Gifts to Individuals Corporate funds were used to purchase gifts during the taxable years, as follows: Taxable Year Ended April 30
Gifts
1956
1957
1958
Bruce Fox Wrought Metal - Fighting Stallions
$192.00
Bruce Fox Wrought Metal - St. George & Dragon
240.00
Great Lakes Airmotive - Plane Radio
427.35
Kay-Bee Appliance Company
$ 298.65
Saks Fifth Avenue
169.95
Saks Fifth Avenue
180.25
J. L. Hudson Company
300.53
Kay-Bee Appliance - Dryer
185.40
Kay-Bee Appliance - Washer
298.65
Kay-Bee Appliance - Two TV's
400.00
Saks Fifth Avenue
145.00
Kay-Bee Appliance - TV
503.81
Ned's Auto Supply - TV
407.00
Bruno Appliance - Norge Dryer to 10009 Ashton
$ 169.95
Guild Camera & Record Shop - Camera to Dr.
Mario Lopez
840.00
Guild Camera & Record Shop - Camera to J. S.
Isnard
840.00
Ned's Auto Supply - TV
768.25
Total Gifts
$859.35
$2,889.24
$2,618.20
*109 The above expenses were disallowed by respondent to the corporation and added to the taxable income of George and Shirley Simon in the amounts of $2,111.78 for 1956 and $1,080.76 for 1957. Among these gifts were two invoices from the Guild Camera Shop dated March 5, 1958, for cameras sent by the corporation to Mario Lopez and J. S. Isnard. Both of these cameras were shipped to the same address in Brazil where Mario Lopez and his associate maintained their offices. Each camera cost $840 and was purchased by the corporation and given to Lopez, who was on a business trip in the United States and requested assistance in locating cameras. George Simon did not know whether Lopez intended to reimburse the corporation for the cost of the cameras, and because Lopez was a valued customer with whom the company had done and was doing a substantial amount of business, George did not request payment. Also included among such gifts is a Kay-Bee Appliance Company invoice in the amount of $503.81, which was identified as a television set sent to Bill Sage, an extremely wealthy person who sometimes involved George Simon in various of his charities. The gift was given to a nuns' home and not for Sage's *110 own use. However, the charity was not positively identified. Another gift in the amount of $298.65 purchased from the Kay-Bee Appliance Company was a wedding gift to a corporate employee. Respondent has conceded the deductibility of this item. The corporation has not identified the recipients of any of the other gifts shown in the above schedule. The other gifts disallowed to the corporation by respondent were not explained. Facts Concerning Ford Station Wagon Respondent disallowed to the corporation a deduction for the taxable year ended April 30, 1958, in the amount of $663.63 for expenses in connection with the operation of a company-owned Ford station wagon. This amount was determined by respondent to have been paid for the personal use and benefit of George and Shirley Simon and was added to their income during the years 1957 and 1958 in the respective amounts of $449.10 and $214.53. The year 1958 is not before the Court. No evidence was introduced to substantiate the claimed deduction. Facts Concerning Travel Expenses of Shirley Simon and Others Respondent disallowed expenses paid by the corporation during the taxable year ended April 30, 1958, in the amount of $1,387.08 for *111 the personal travel of Shirley Simon and other members of the Simon family. This included amounts for the benefit of Shirley paid to Gill Hotels, Florida, Grossingers Hotel, New York, and American Airlines for travel to Florida in the respective amounts of $148.29, $168.39, and $100.03. All of these amounts were determined by respondent to be for the personal benefit of George and Shirley Simon and taxable to them as income for the calendar year 1957. Also included was an amount of $366.52 for a trip to Phoenix by George's brother-in-law, Fred Wissman, $371.75 for a trip to Phoenix by a Mrs. Sheban and her daughter, and $232.10 spent for the unexplained travel of an unidentified person. These amounts were determined by respondent to have been made for the personal use and benefit of George and Shirley Simon and to constitute taxable income to them for the calendar year 1958, which is not before the Court. No evidence was introduced to explain these expenditures. Facts Concerning Depreciation of Building George Simon purchased a tract of approximately 1.4 acres in late January 1956 for $145,000. The petitioner allocated $130,000 of this purchase price to the building and $15,000 to *112 the land. Based upon a useful life of ten years, George claimed depreciation for 11 months in 1956 in the amount of $11,917. For 1957 he claimed depreciation in the amount of $13,000. Respondent determined the useful life of the building to be 20 years. Respondent also determined that the purchase price of $145,000 should be allocated $30,000 to the land and $115,000 to the building. Based upon these determinations the respondent disallowed to George depreciation for 1956 and 1957 in the respective amounts of $6,646.17 and $7,250. The useful life of the building is 20 years. The proper allocation of purchase price between land and building is a valuation of $28,000 for the land and $117,000 for the building. Facts Concerning Fair Rental Value of Building In late January 1956 George purchased from the Pakard Motor Car Company a parcel of land approximately 1.4 acres in area which was improved by a single story, factory type structure. The area of the land is approximately 72,504 square feet. The building has an area of approximately 51,511 square feet. Near the end of January 1956 the corporation moved its place of business to the newly acquired property. These premises are known *113 as 6540 East Palmer Avenue, Detroit, Michigan. Beginning on February 1, 1956, the corporation paid rental to George Simon for the premises of $3,000 per month. The corporation and George entered into a lease dated April 19, 1957, which provided for a monthly rental of $3,000 for the premises for a term commencing May 1, 1957, and ending April 30, 1962. The corporation claimed a rental deduction for the taxable year ended April 30, 1956, in the amount of $9,000 (3 months rental at $3,000 per month). After certain adjustments and concessions by respondent, there now results a disallowance of $1,273.35 of the rental deduction as excessive. The corporation deducted as rent $36,000 for each of the taxable years ended April 30, 1957, and 1958. This is at the rate of $0.697 per square foot. After adjustments and concessions, the respondent had disallowed as being excessive $5,093.40 of the $36,000 rental claimed by the corporation for each of these two years. Respondent based its determination on an annual fair rental value for the premises (51,511 square feet) of $0.60 per square foot. The corporation claims the fair rental value is $0.75 per square foot per year. The building is a one-story *114 structure consisting of bays and having a saw-tooth, tiled roof. The walls are masonry with steel sashes. The floors are heavy duty concrete with most of the area covered with creosote wood blocks. It is suitable for heavy machinery. It is served with all utilities. Most of the building was constructed in 1915 and 1917 with the exception of a small area built in 1939. The fair rental value of the property in the years 1956, 1957, and 1958 was 69.7 cents per square foot. Opinion tiIssue 1 - Racing Boats The main issue presented in this case is whether the amounts incurred by the U.S. Equipment Company for its boat racing activities were undertaken at the outset and subsequently pursued as an advertising and public relations device for the benefit of the corporation and were therefore deductible as ordinary and necessary business expenses under section 162(a), Internal Revenue Code of 1954. Petitioners contend they were; respondent argues they were not. The record in these consolidated cases consists of oral testimony of 1,140 pages and over 96 exhibits were introduced in evidence at the trial. Twenty-four witnesses testified. This issue is primarily factual and the petitioner corporation *115 has the burden of proving that the boat racing expenditures were ordinary and necessary to the operation of its business in order to sustain its claim to their deductibility. Deputy v. duPont, 308 U.S. 488 (1940). Many times the courts have construed this language and have imposed tests for determining whether an expense is, in fact, ordinary and necessary. These tests are generally stated in terms of defining the petitioner's burden of proof. With respect to "ordinary," Justice Cardozo, in Welch v. Helvering, 290 U.S. 111 (1933), expressed it in the following manner: Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the taxpayer will have to make them often. * * * Here, indeed, as so often in other branches of the law, the decisive distinctions are those of degree and not of kind. One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must *116 supply the answer to the riddle. Quite obviously, the nature and scope of the taxpayer's business constitutes one important factor. The expenditure must have a reasonably proximate relation to the conduct of such business. [1] It is to be judged against the habits and customs of American businessmen. "Necessary" does not mean "mandatory" in the sense of a legal obligation to pay. Rather, the word has been held to mean "appropriate" or "helpful." Blackmer v. Commissioner, 70 F. 2d 255 (C.C.A. 2, 1934). An expenditure will ordinarily be considered "necessary" if it is appropriate and helpful in promoting, protecting, and maintaining business. [2] *117 The petitioner's burden was to show the "proximate relationship" between the boat racing program and the corporation's business and to demonstrate that such a device was "reasonably calculated to advertise" its business. See W. D. Gale, Inc., v. Commissioner, 297 F. 2d 270 (C.A. 6, 1961), affirming a Memorandum Opinion of this Court. Petitioner submits that under these tests of "ordinary and necessary" it has sustained its burden of proof. We agree. As to the proximate relationship of the boat racing and the corporate business, the record contains convincing evidence as to the manner in which the corporation capitalized on its boat racing program and the devices employed in doing so. The evidence further establishes that the boat racing program was reasonably calculated to call attention to the corporation's business in a manner that might reasonably be expected to produce patronage benefit. We think the primary purpose of George Simon in undertaking boat racing, first as the sole proprietor and later as *118 the principal stockholder of the U.S. Equipment Company, was to publicize and promote the business of that company. In view of the response to the boat racing program which it experienced throughout the industry and the successful extension of its business during the period following the Korean War when sales were declining in the industry generally, we are persuaded as to the reasonableness of petitioner's belief that its program did promote and advertise its business throughout the years in issue. Several factors are relevant to our conclusion that the expenses were ordinary and necessary to the conduct of petitioner's business. Although our Findings of Fact are complete in this respect, we will nevertheless mention some of these factors. They are: 1. The petitioner's racing program was initially undertaken for the sole purpose of publicizing the business of U.S. Equipment Company. The history of the business prior to its first acquisition of a racing boat, as set forth in our Findings of Fact, is material in determining the reasonableness of the acquisition. It shows how George Simon struggled in getting his business started and its rapid expansion after the racing boat was acquired. *119 It is also significant that never in any discussion which George Simon had with others concerning the racing boat did he ever indicate his intention of purchasing the boat in terms other than business publicity. [3]
2. The petitioner's racing boat program was continued and carried forward primarily for the benefit of U.S. Equipment Company and with ample reason to believe in its value to the business. See Rodgers Dairy Co., 14 T.C. 66 (1950), acq. 1950-2 C.B. 4. The dominant reason for the program was to advertise the corporation's business. It was not carried out for the personal pleasure or aggrandizement of George Simon. Cf. Robert Lee Henry, supra, where we held that there was merely a remote or incidental - rather than proximate - relationship between claimed expenses of a yacht *120 and the taxpayer's practice as a lawyer and accountant. Throughout its boat racing history company customers consistently showed interest in the Miss U.S. boats and even greater interest in their technical and mechanical aspects. To understand this, it is important to consider the nature of the individuals who are the user-customers of the corporation. These people are not purchasing agents. They are master mechanics, technicians, and engineers. They are the people who tell their purchasing agents which machines to buy and how much to pay for them. The evidence shows that unlimited power boat racing had a great appeal to the mechanically inclined individuals with whom the corporation constantly dealt. Almost from the day the boat was ordered and continuing throughout the years in issue, the corporation received publicity - locally, nationally, and internationally - as the result of its racing activities. Not only was this publicity found on the radio, in newspapers throughout the United States, and on national and local television, but a considerable amount of publicity was spread by word-of-mouth from one customer or prospect of the U.S. Equipment Company to another. Examples of this *121 are found in the testimony of Clarence O'Heron and Leo S. MacKay. 3. The petitioner derived substantial business benefits from its hydroplane racing program and the proximate result thereof. The effect of publicity on that specific segment of the public which was engaged in buying and selling used machinery cannot be underestimated. People who dealt with the petitioner had a special interest in racing and mechanical affairs and were therefore more susceptible to these types of publicity than the average sports or racing fan. Moreover, the dramatic visual impact of television, with its attention not only to the race course but also to the activities in the pits, held a special appeal. It is true that publicity, as such, is not of much value unless it produces or helps to retain some business. This can also be said of the very existence of the racing boat as a business device. However, the evidence shows that the Miss U.S. I did just that. A comparison of the corporation's sales progress with the National Index of Used Machine Tool Sales compiled by the Machinery Dealers National Association, as contained in our Findings of Fact, indicates that while the industry as a whole declined *122 sharply from 1952 through 1958 in all but 2 years, the petitioner, on the other hand, increased its sales year-by-year with the exception of 2 years. The corporation during the years in issue was selling at a rate roughly three times that of its best preboat year, and the company, within what witnesses described as an especially short period of time, rose from a relatively unknown business concern to one of the leaders in the used machine tool industry. The facts thus demonstrate that this rise was accomplished by change in the georgraphic extent of the market of the U.S. Equipment Company, just as George Simon had initially foreseen when first considering the acquisition of the racing boat. From approximately 15 percent of its sales volume outside the State of Michigan and Windsor, Ontario, in the 1951-52 period, its records show that in the years in issue more than 56 percent of its sales volume was outside the local area. 4. The nature of the devices used by the petitioner corporation in connection with its racing program indicate that they were well calculated to publicize and benefit its business and, in fact, did so. All of petitioner's use of the race boat was business oriented. *123 Examples of this are spelled out in our Findings of Fact. In support of his rather unrealistic and confined view of "advertising" respondent cites Southwestern Electric Co. v. United States, 312 F. 2d 437 (Ct. Cls., 1963). This case is easily distinguishable from the instant case. In the first place, it did not deal with publicity or with public relations. It was confined strictly to the deductibility of printed newspaper advertising. However, the advertisements in the Southwestern Electric case were for lobbying purposes seeking to generate public resentment against the United States Government entering the business of supplying electric power, and the case was decided upon the basis of a clear Treasury regulation expressly prohibiting the deduction of such lobbying expenses. It is factually dissimilar. Respondent urges that the petitioner's real reason for racing hydroplanes was to gratify the personal, daredevil impulses of George Simon. We find no support in the record for this position. Respondent surmises that the real reason George Simon drove the boat in some of the earlier races was because he thought it was "fun" and because he wanted to be a "national hero." But, as shown *124 by the record, the reason for George's driving was to secure recognition for himself as the sole proprietor of his business. It is clear that in the used machinery business a company's key man is widely identified with the company and, therefore, recognition and publicity accruing to the key man is recognition for his company. This is not the type of situation we considered in Ralph E. Larrabee, supra, which involved the deductibility as a business expense of the cost of maintaining a luxurious yacht by a would-be expense-account aristocrat. Because respondent relies principally upon two cases, W. D. Gale, Inc., supra, and American Properties, Inc., 28 T.C. 1100, affd. 262 F. 2d 150 (C.A. 9, 1958), we think it is important to show how their facts differ from those in the instant case. The petitioner in the Gale case made efforts to capitalize on the publicity of its racing boats which we found was only "incidental" to its business. We sensed a lack of direction in the publicity generated by the Gale racers since it was aimed at the general public rather than at any particular business segment of the W. D. Gale, Inc., customers, and further that the publicity did not identify *125 W. D. Gale, Inc. Contrast that situation with the on-target impact of the Miss U.S. racing publicity upon the master mechanics, engineers, and other technical people who, as primary buyers of used machinery from the U.S. Equipment Company, identified the company with its hydroplane racing publicity. Other significant distinctions can also be pointed out. In the Gale case, we did not believe that the mere name "Gale" on the boats identified the company. Here the record shows that the company's name and trade emblem were at all times on the boat, as well as on related racing equipment. There was nothing in the record of the Gale case which indicated that boat racing was selected as a means of overcoming any purely business obstacle. In contrast, the record in this case shows that petitioner's major problem was to find a "door-opener" and to become known. That problem was attacked specifically by the use of the boat on salesmen's calling cards. Nothing in the record in the Gale case established an industry-wide custom of identifying the principal individual of the company with the company name. Yet this important custom was, as shown by this record, clearly present with respect to the *126 U.S. Equipment Company and George Simon. Other facts distinguishing the instant case from the Gale case are that in this case the hydroplane was used to a considerable extent in the trade journal advertising of the corporation and the racer itself was displayed with its trophies at the company's place of business. Finally, in the Gale case numerous newspaper and similar clippings collected by the taxpayer were introduced to show the publicity received. Of over 500 such clippings there were in the years in issue only two references to the Gale Company. By contrast, in the instant case there were 20 newspaper articles from the pre-April 30, 1958 period, 10 of which identified the business of the U.S. Equipment Company. Unlike the Gale case, the racing boat program of this petitioner during the years in question was not designed to create for George Simon "the stature of a leading sportsman," but was primarily for the purpose of publicizing the petitioner corporation and its products. We also regard American Properties, Inc., supra, as distinguishable on its facts from this case. The issue in American Properties was not whether the amounts expended in the operation and maintenance of *127 the racing boats were advertising expenses of the corporation, but whether the activities were a part of its corporate business or merely the "personal hobby of the petitioner, Sayres, sole owner of the corporation." Stanley Sayres was a well known power boat racing enthusiast with "an insatiable desire for speed," who for many years had driven his own boat, the Slo-Mo-Shun, and held the "world straightaway speed record." We held that the deductions claimed were not business expenses, primarily because there was no benefit to the corporation and no requisite intent or motive of making a profit. The record in that case was replete with evidence to the effect that such activities were purely the personal hobby of Sayres and were not in the least business oriented. It is abundantly clear from the whole record in the instant case that the same situation does not prevail here. We have found as a fact that boat racing was not the hobby of George Simon. Respondent's attempt throughout the trial to explain the race boats as the gratification of George's supposed "hot rod daredevil" instincts fell flat. The fact that he was a Naval aircraft pilot hardly makes him a daredevil. We are convinced *128 from the testimony adduced at the trial that George Simon, who did not drive the boats during the years in issue, had as his principal motive for driving the first Miss U.S. boat a desire to benefit his business by becoming personally well known. Accordingly, upon full consideration of all the evidence, we hold that the deductions for the racing boat expenses and depreciation are allowable in their entirety as ordinary and necessary expenses incurred by the corporation in advertising and promoting its business. Issue 2 - Taxability of Racing Boat Expenditures to Simon Having determined that the deductions for racing boat expenses and depreciation constituted ordinary and necessary business expenses of the U.S. Equipment Company, it follows that such amounts are not taxable income to the individual petitioners, George and Shirley Simon. Issue 3 - Gifts Respondent has conceded that the wedding gift to the corporate employee in the amount of $298.65 purchased from the Kay-Bee Appliance Company is deductible. On the record we find that the two cameras, which cost $840 each, given to Mario Lopez and J. S. Isnard, customers of U.S. Equipment, were ordinary and necessary business expenses. *129 The evidence is insufficient to establish that the television set given to Bill Sage for the use in a nuns' home was an ordinary and necessary business expense. Petitioner has failed to prove that all other gifts shown in our Findings of Fact were ordinary and necessary business expenses. The recipients were not identified, other than by George Simon's general testimony that all were customers of the corporation. The reasons for purchasing the items were unexplained. We therefore sustain respondent's determination as to such items. Issue 4 - Station Wagon The corporation introduced no evidence to substantiate the claimed deduction of $663.63 for expenses paid in connection with the operation of the Ford station wagon. Petitioner had the burden of proof and has not met it. We hold that respondent properly disallowed the expenses and that the amount of $449.10 is includable in the taxable income of George and Shirley Simon for the year 1957. Issue 5 - Travel and Hotel Petitioner has failed to prove that deductions claimed in the taxable year ended April 30, 1958, of $416.71 for the travel of Shirley Simon and $970.37 for the travel of others were ordinary and necessary business expenses. *130 Such expenses are therefore disallowed to the corporation. We also hold that the amount of $416.71 constitutes taxable income to George and Shirley Simon in the calendar year 1957. Issue 6 - Depreciation on Building The individual petitioners claimed depreciation on the building rented to the corporation during the taxable years 1956 and 1957 in the respective amounts of $11,917 and $13,000. These depreciation deductions were calculated on the basis of a building cost of $130,000 and a useful life of 10 years. Respondent disallowed as excessive depreciation for the taxable years 1956 and 1957 the respective amounts of $6,646.17 and $7,250. This disallowance was based on respondent's determination that of the $145,000 purchase price paid by George for the land and building in late January 1956, $30,000 should be allocated to the land and $115,000 to the building. Respondent also determined that the useful economic life of the building was 20 years rather than 10 years. Petitioners did not offer any evidence with respect to the useful remaining life of the building as of February 1, 1956, the approximate date of its acquisition. On the other hand, respondent offered expert testimony *131 that the building should be assigned a minimum useful remaining life of 20 years from that date. Petitioners have failed to sustain their burden of proof with respect to the remaining useful life of the building. Accordingly, we sustain respondent's determination. There was a dispute as to the amount of cost that should be allocated to the land in determining the depreciation base of the building. In the opinion of Herbert Wilson, the petitioner's expert, the land had a value of $28,000. In the opinion of Robert Collins, the respondent's expert, the land should have been assigned a value of $30,000. We have found as a fact that the proper allocation of the purchase price between the land and the building is a valuation of $28,000 for the land and $117,000 for the building. Issue 7 - Fair Rental Value of Building The corporation deducted rent at the rate of $3,000 per month for the last 3 months of the taxable year ended April 30, 1956, and for each of its taxable years ended April 30, 1957 and 1958. It deducted rent at the rate of 69.7 cents per square foot. The corporation claims the fair rental value of the 51,511 square feet of space rented from George Simon was 75 cents per square *132 foot. Respondent determined that the fair rental value was 60 cents per square foot. Petitioner's expert witness, Herbert Wilson, is a highly qualified real estate broker whose qualifications include a substantial volume of sales and rentals in Detroit industrial property and whose company handled such transactions connected with the Packard properties, of which the premises in issue were a part. He testified on the basis of comparative properties that the fair rental value of the premises was 75 cents per square foot. Respondent's expert witness, Robert Collins, estimated the fair rental value of the property to be 60 cents per square foot. Collins has an educational background and prior experience in engineering, but no experience in buying and selling real estate, nor has he ever appraised properties for anyone other than respondent. His testimony indicates that his appraisal experience with respondent included very little work in connection with Detroit industrial property. The principal ground on which he based his opinion was on the rental values of other properties within the Packard complex, many of which were multistoried and therefore not comparable to the premises in question. *133 On the record before us we hold that the rental paid by the corporation to George Simon was not excessive. We decide this issue for petitioner. To reflect concessions and adjustments made by the parties, Decisions will be entered under Rule 50. Footnotes
1. Consolidated herewith for trial, briefing, and opinion is the proceeding of George Simon and Shirley Simon, Docket No. 85379.↩
*. Average from nearest applicable quarters of index.
*. This $135,150.31 of sales came from only 15 customers, 5 of whom were dealers, with over $80,000 of it coming from Chevrolet's Buffalo and Tonawanda, N. Y., plants.↩
1. In this connection, see Ralph E. Larrabee, 33 T.C. 838 (1960); Eugene H. Walet, Jr., 31 T.C. 461 (1958), affd. per curiam 272 F. 2d 694 (C.A. 5, 1959); Robert Lee Henry, 36 T.C. 879 (1961); and Challenge Manufacturing Co., 37 T.C. 650↩ (1962). Our opinions in these cases strike hard at the causation factor. The references to proximate relationship are complemented by phrases like "substantial connection," "significant bearing," and "genuinely related."
2. Compare Dunn & McCarthy, Inc. v. Commissioner, 139 F. 2d 242 (C.A. 2, 1943); Cubbedge Snow, 31 T.C. 585 (1958); C. Doris Pepper, 36 T.C. 886 (1961); Charles J. Dinardo, 22 T.C. 430 (1954); Scruggs-Vandervoort-Barney, Inc., 7 T.C. 779 (1946); and Edward J. Miller, 37 B.T.A. 830↩ (1938).
3. Even respondent's witness, Henry Drettmann, president of Active Tool and Manufacturing Company, testified that George Simon told him "he would like to expand his business not only locally but over the whole nation." Simon also said to him: "Well, I think I am going to buy a boat and then that will be known nationally as well as internationally, and I think I am going to drum up some business that way."↩